UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

BRIDGET MATLOCK, o/b/o D.S.,      )
                                   )
            Plaintiff,             )
                                   )
      v.                           )     Case No. 4:11CV1322 FRB
                                   )
MICHAEL J. ASTRUE, Commissioner    )
of Social Security,                )
                                   )
            Defendant.             )

**MEMORANDUM AND ORDER**

        This cause is before the Court on plaintiff's appeal of an adverse determination by the Social Security Administration. All matters are pending before the undersigned United States Magistrate Judge, with consent of the parties, pursuant to 28 U.S.C. § 636(c).

## I.  Procedural History

        On April 7, 2009, the Social Security Administration denied plaintiff Bridget Matlock's November 20, 2008, application for Supplemental Security Income filed on behalf of her son, D.S., pursuant to Title XVI of the Social Security Act, 42 U.S.C. §§ 1381, et seq. (Tr. 43, 44-48.)  At plaintiff's request, a hearing was held before an Administrative Law Judge (ALJ) on January 29, 2010, at which plaintiff and D.S. testified.  (Tr. 27-42.)  On May 17, 2010, the ALJ denied plaintiff's claim for benefits.  (Tr. 7-22.)  On May 27, 2011, the Appeals Council denied plaintiff's request for review of the ALJ's decision.  (Tr. 1-4.)  The ALJ's

decision is thus the final decision of the Commissioner.  42 U.S.C.
§ 405(g).

## II.  Evidence Before the ALJ

A.   Testimony of D.S.

At the hearing on January 29, 2010, D.S. testified in
response to questions posed by the ALJ.

At the time of the hearing, D.S. was eight years of age
and in the first grade at Armstrong Elementary School.  D.S.
testified that math was his favorite subject and that science was
his least favorite subject.  D.S. testified that he had friends at
school and that he wanted to be a football player when he grew up.
D.S. testified that he had brothers and sisters at home, both older
and younger than him, and that he got along with them "fine."  (Tr.
30-32.)

B.   Testimony of Plaintiff

At the hearing, plaintiff testified in response to
questions posed by the ALJ and counsel.

Plaintiff testified that D.S. was currently in the first
grade and had repeated first grade.  Plaintiff testified that D.S.
had disciplinary problems at school and had sustained both in-
school and out-of-school suspensions.  Plaintiff testified that
since his enrollment in school, D.S. had been suspended on five
occasions.  (Tr. 33.)  Plaintiff testified that D.S.'s teacher

reported D.S. to be difficult to redirect and difficult to calm down on a bad day.  (Tr. 35.)

Plaintiff testified that D.S. does not understand or like to do his homework.  Plaintiff testified that she helps D.S. with his homework when he allows her to but that D.S. sometimes hides in the closet when it is time to do his homework, hides his homework, or will not bring it home from school.  (Tr. 37.)

Plaintiff testified that D.S. has three brothers and one sister and that all of the children live with her.  Plaintiff testified that D.S.'s father was incarcerated.  (Tr. 34.) Plaintiff testified that she was not currently working and that D.S. receives assistance from Medicaid.  (Tr. 40.)

Plaintiff testified that D.S. was currently being treated by a psychiatrist and that D.S.'s current medications included Adderall and Risperdal.  (Tr. 34-35.)  Plaintiff testified that D.S. had previously been prescribed Tenex, but that she determined to stop the medication because it caused D.S.'s heart to race. Plaintiff testified that D.S. had been born with a heart murmur. (Tr. 40.)

Plaintiff testified that D.S.'s problems included anger, fighting, bullying, and blaming others.  Plaintiff testified that D.S. displays hostility toward authority figures such as teachers, security guards, and his brothers and sister.  Plaintiff testified that D.S. picks fights with his brothers, his few friends, and

children in the neighborhood and at school. (Tr. 35-36.) Plaintiff testified that D.S. also fails to understand consequences and does not want to follow safety rules. Plaintiff testified that she must lock up knives and sharp objects to keep them from D.S. Plaintiff testified that D.S. previously had "pulled a knife" on a child from the neighborhood. Plaintiff testified that D.S. also had problems on the school bus with throwing things, not sitting down, and cursing at the bus driver. Plaintiff testified that D.S. had been suspended from riding the bus but was allowed to return. (Tr. 37-39.)

Plaintiff testified that D.S. likes to draw but does not stay with a project beyond fifteen minutes. Plaintiff testified that D.S. will later come back to the project. Plaintiff testified that D.S. has chores assigned to him at home, such as washing dishes and cleaning his room, but that he throws tantrums and will eventually perform the work if plaintiff "stay[s] on him." (Tr. 39-40.)

### III.  Medical, School and Counselor Records

D.S. underwent a psychological evaluation on September 11, 2007, in response to plaintiff's concerns regarding D.S.'s behavior and suspicions of Attention Deficit Disorder (ADD) and Behavior Disorder. D.S. was five years of age and in kindergarten. Plaintiff arrived at the evaluation with D.S. and two of his brothers. Dr. Lisa Dahlgren observed the brothers to actively play

- 4 -

which quickly escalated into arguing and physical fighting, to the
point where plaintiff had to physically pull the brothers apart.
Dr. Dahlgren noted that D.S. was choking his younger brother with
his hands around his throat before plaintiff could pull them apart.
Once apart, the fighting between the boys resumed with fist punches
to the face and stomach.  Plaintiff reported to Dr. Dahlgren that
she had been concerned with D.S.'s behavior since he was two years
of age because of extreme and violent temper tantrums.  Plaintiff
reported that D.S.'s temper tantrums became more dangerous as he
grew older because he became stronger.  Plaintiff reported that
D.S. once threatened to kill his brother and went searching in the
kitchen for a knife sharp enough to cut and kill him.  Plaintiff
reported that D.S.'s daycare facility warned plaintiff that they
would call the police because of D.S.  Plaintiff also reported that
D.S. was eventually expelled from daycare.  Plaintiff reported that
D.S. is often "in his own world" and does not seem to be in touch
with his surroundings.  Plaintiff reported that D.S. was seeing a
therapist who had come to the home during the previous month.
Plaintiff reported D.S. to be on a waiting list for medication.
During D.S.'s evaluation, Dr. Dahlgren noted it difficult to
establish rapport with D.S. and that D.S. appeared not to easily
comprehend what was asked of him.  Mental status examination showed
D.S. to be oriented times three with no evidence of hallucinations.
D.S. did not follow commands well and needed reminders with two-

step commands.  D.S. needed to be redirected frequently to stay on
task.  Memory tasks were unremarkable.  Social evaluation was
difficult given D.S.'s demeanor, both with physically fighting with
his brothers and ignoring Dr. Dahlgren's presence.  Dr. Dahlgren
noted no unusual affective features.  Upon conclusion of the
evaluation, D.S. returned to the waiting room whereupon Dr.
Dahlgren observed him to grab items, run, topple lamps and
magazines, and physically fight with his brothers.  Dr. Dahlgren
diagnosed D.S. with ADD, combined type; and Oppositional Defiant
Disorder (ODD).  Dr. Dahlgren assigned a Global Assessment of
Functioning (GAF) score of 45.[1]   (Tr. 231-34.)  Dr. Dahlgren
opined:

> [D.S.] is not functioning like a typical 5
> year old.  It is unclear if he is able to
> process information in a timely or even
> accurate manner.  He exhibited a lack of
> focus, and inattention.  Socially, he is
> either immersed in his own fantasy of who he
> is, attempts to dominate others through
> physical means, or appears to disregard those
> around him as one may disregard the furniture.
> The constellation of symptoms [D.S.] exhibits
> is consistent with children who have moderate
> to severe attachment issues.  He will most
> likely have difficulty learning at a rate
> consistent with his peers, already has social

_____

[1]A  GAF  score  considers  "psychological,  social,  and
occupational functioning on a hypothetical continuum of mental
health/illness."  Diagnostic and Statistical Manual of Mental
Disorders, Text Revision 34 (4th ed. 2000).  A GAF score of 41-50
indicates  serious  symptoms  (e.g.,  suicidal  ideation,  severe
obsessional  rituals,  frequent  shoplifting)  or  any  serious
impairment in social, occupational, or school functioning (e.g., no
friends, unable to keep a job).

difficulties with peers and those in authority, and has an energy level and focus limitations that make him difficult to control. Medication may be helpful for [D.S.] Other helpful tools his mother is seeking at this time are in-home therapy services, and her own education regarding discipline and structure around the house. Given the degree of impairment observed in this office, his school will most likely also make plans for interventions to decrease environmental stimulation and increase daily structure. Once these measures are all in place, [D.S.] should be able to respond with greater learning and social potential. The degree to which his difficulties will remit is uncertain.

(Tr. 234.)

D.S. underwent an initial psychiatric evaluation with Dr. Muddasani on July 20, 2008. D.S. was six years of age. Dr. Muddasani noted D.S. to have been expelled from school. D.S.'s mood was noted to be depressed with decreased affect. D.S.'s thought processes were noted to be normal. D.S. was diagnosed with Attention Deficit Hyperactivity Disorder (ADHD) and Concerta[2] was prescribed. (Tr. 251-52.)

In an undated Care Team Report from Armstrong Elementary, it was noted that in the 2008-09 school year, D.S. was in the first grade and demonstrated strengths in music and art, and liked numbers and math concepts. It was reported that D.S. exhibited disruptive behavior, was out of his seat frequently, and had

---

[2]Concerta is used to control symptoms of ADHD. Medline Plus (last revised Jan 1, 2011)<http://www.nlm.nih.gov/medlineplus/ druginfo/meds/a682188.html>.

trouble retaining information.  (Tr. 120.)  An ADD Rating Scale completed October 23, 2008, showed D.S. to meet the behavior criteria for ADD.  (Tr. 121.)

In a report dated December 12, 2008, Dr. A. Menon reported that he last saw D.S. on March 29, 2007, at which time there was no concern regarding ADHD.  Dr. Menon stated that physical examination and developmental milestones were within normal limits at that time.  (Tr. 235-36.)

On January 14, 2009, Michele Chitwood, D.S.'s classroom teacher at Armstrong Elementary, completed a Teacher Questionnaire for disability determinations.  D.S. was in the first grade.  Ms. Chitwood reported that she taught all core subjects to D.S. five days a week, seven hours a day.  Ms. Chitwood reported that D.S. did not receive special education but received reading support for half an hour every day.  Ms. Chitwood reported that D.S. performed at grade level in reading and math, and below grade level in written language.  Ms. Chitwood reported that there was no degree of excessive absenteeism with D.S.'s attendance at school.  Ms. Chitwood opined that D.S. had problems functioning in the domain of acquiring and using information in that D.S. had very serious problems reading and comprehending written material, expressing ideas in written form, and learning new material; serious problems comprehending and/or following oral directions, understanding school and content vocabulary, providing organized oral

explanations and adequate descriptions, recalling and applying previously learned material, and applying problem-solving skills in class discussions; and an obvious problem understanding and participating in class discussions.  Ms. Chitwood reported that D.S. needed a great deal of support and supervision to complete reading and writing tasks, and that D.S. received assistance from a peer tutor and the reading teachers.  Ms. Chitwood opined that D.S. had very serious problems in all areas of the domain of attending and completing tasks, with D.S. exhibiting such problems on an hourly basis in the areas of paying attention when spoken to directly, sustaining attention during play/sports activities, focusing long enough to finish assigned activities or tasks, refocusing to task when necessary, carrying out single-step and multi-step instructions, waiting to take turns, and changing from one activity to another without being disruptive.  Ms. Chitwood reported that D.S. struggled to do any work without supervision or assistance and that D.S. received peer or teacher help on most tasks daily.  In the domain of interacting and relating with others, Ms. Chitwood reported that D.S. had problems with focusing, becoming frustrated easily, and giving up or refusing to try.  Ms. Chitwood reported that behavior modification strategies had been implemented, including rewards for good choices and completed tasks.  Ms. Chitwood reported that D.S.'s speech could be understood almost all of the time.  In the domain of moving about

and manipulating objects, Ms. Chitwood reported that D.S. had no problems.  In the domain of caring for himself or others, Ms. Chitwood opined that D.S. had very serious problems in the area of knowing when to ask for help; serious problems in the areas of identifying and appropriately assessing emotional needs, and responding appropriately to changes in his own mood; and obvious problems handling frustration appropriately, being patient when necessary, and using appropriate coping skills to meet daily demands of the school environment. Ms. Chitwood reported that D.S. had no or slight problems in the areas of taking care of personal hygiene, caring for physical needs, cooperating in or being responsible for taking medications, and using good judgment regarding personal safety and dangerous circumstances.  Ms. Chitwood reported that D.S. slammed things or yelled at others when he was angry, and often blamed others for his choices.  Ms. Chitwood reported that she was unaware of any physical condition or effect which affected D.S.'s functioning at school.  Ms. Chitwood reported that D.S. was prescribed medication, that D.S. did not take the medication on a regular basis, and that D.S.'s functioning changed after taking medication.  Ms. Chitwood reported that D.S. took medication when he first started school and could do his class work much better at that time.  (Tr. 112-19.)

D.S. underwent a psychological evaluation on March 31, 2009, for disability determinations.  (Tr. 240-44.)  D.S. was seven

- 10 -

years of age.  It was noted that D.S. was in the first grade and had repeated kindergarten.  It was noted that D.S. did not receive special education services, but that he received reading support at school.  Psychologist Alison Burner noted D.S. to have been diagnosed with ADHD and ODD and to have been prescribed Risperidone[3] and Concerta.  Ms. Burner questioned plaintiff as to why the medication bottles were full when the prescriptions had been filled two months prior, but plaintiff did not respond. Plaintiff reported D.S. to engage in bad behavior at home, such as jumping on furniture, arguing with siblings, and failing to do homework; and that D.S. engaged in similar behavior at school.  Ms. Burner noted the Teacher Questionnaire to indicate reading weaknesses and attention problems.  Ms. Burner noted plaintiff and D.S.'s teacher to report D.S. to have a very short attention span, poor concentration, impulsiveness, and constant movement and noise making.  Ms. Burner noted D.S.'s reported and observed symptoms to be consistent with ADHD, but not consistent with ODD.  During the evaluation, Ms. Burner noted D.S. to be cooperative with the testing process and his affect to be within normal limits.  No psychomotor agitation was present.  D.S.'s speech was intelligible and his social language functioning was within normal limits.

---

[3]Risperidone (Risperdal) is used to treat the symptoms of schizophrenia; episodes of mania or mixed episodes persons with bipolar disorder; and behavior problems such as aggression, self-injury, and sudden mood changes in children who have autism. Medline Plus (last revised June 15, 2011)<http://www.nlm.nih.gov/ medlineplus/druginfo/meds/a694015.html>.

D.S.'s full scale IQ was measured to be 90, which placed D.S. in the average range of intellectual functioning.  In IQ subtesting, D.S. placed in the average range throughout.  Mental status examination showed D.S. to be appropriately oriented times three and able to provide specific demographic information.  D.S. denied having any psychiatric difficulties, including hallucinations, depression, paranoia, and anxiety.  D.S.'s mental calculations and control were noted to be adequate, with basic calculations performed at an age appropriate and functional level.  Ms. Burner noted D.S.'s insight and judgment to be average.  No deficits were noted in adaptive functioning.  D.S. reported that he had friends at home and at school.  Ms. Burner noted D.S. to be able to take care of himself and able to perform chores with reminders and supervision.  Upon conclusion of the evaluation, Ms. Burner diagnosed D.S. with ADHD-combined type, assigned a GAF score of 65,[4] and opined:

> Based upon this evaluation, [D.S.] does appear to meet criteria for ADHD.  With appropriate medical and educational intervention, he should be able to obtain a high diploma [sic]. His ability to relate to the world socially, occupationally, and adaptively, may be below normal limits without treatment.  With treatment, his symptoms should be sufficiently

---

[4]A GAF score of 61 to 70 indicates some mild symptoms (e.g., depressed mood and mild insomnia) or some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships.

controlled and he should be able to attain at
a level commensurate with his ability.

(Tr. 244.)

On April 7, 2009, Dr. Kyle DeVore, a psychological
consultant with disability determinations, completed a Childhood
Disability Evaluation Form in which he opined that D.S. had no
limitations in the domains of acquiring and using information,
interacting and relating with others, moving about and manipulating
objects, caring for himself, and health and physical well-being.
Dr. DeVore opined that D.S. had less than marked limitations in the
domain of attending and completing tasks.  (Tr. 245-49.)

On April 29, 2009, Dr. Muddasani noted that D.S. did not
keep appointments and was not on any medications.  Concerta and
Risperdal were prescribed.  (Tr. 253.)

D.S.'s report card for the first grade in the 2008-09
school year showed him to generally perform at or below basic level
in communication arts, but to perform at the proficient level in
the subcategories of developing and applying effective speaking
skills, developing and applying skills to analyze and evaluate
information, and analyzing and evaluating oral and visual media.
D.S. was generally at the proficient level in math; at the basic or
proficient level in science and vocal music; and at the proficient
level in physical education and art.  It was reported that D.S.
generally had satisfactory behavior in physical education, art and

- 13 -

music.   As  to  work  habits,  it  was  reported  that  D.S.  had
unsatisfactory behavior in the areas of following oral and written
directions,  starting  and  completing  work  on  time,  focusing
attention  to  task,  and  demonstrating  consistent  effort.   D.S.
exhibited satisfactory behavior in the area of using technology and
resource  materials.    (Tr.  126,  172-73.)    In  the  areas  of
communication arts, science, health, and social studies, it was
reported that D.S. was not meeting first grade essential skills.
"[D.S.] is often out of his seat, talking to others instead of
completing his assignments, or staring off into space.  This lack
of concentration throughout the day causes him to miss important
information during our lessons."  (Tr. 127.)

    At the end of the 2008-09 school year, it was recommended
that D.S. be retained in first grade for the following year.  Staff
concerns  supporting  this  recommendation  included  that  D.S.  was
unable to work appropriately with peers, that D.S.'s reading level
was inhibited due to missed instruction on account of behavioral
consequences, and that medical diagnoses of ADHD and ODD had been
reported.  (Tr. 175.)

    On July 22, 2009, Dr. Muddasani noted D.S.'s anger to be
reported as horrible with others.  Dr. Muddasani included ODD as a
diagnosis  and  instructed  that  D.S.  continue  on  his  current
medications.  (Tr. 253.)

On September 1, 2009, D.S. engaged in behavior at school which resulted in a two-day out-of-school suspension.  On September 4, 2009, D.S. engaged in behavior which resulted in a three-day out-of-school suspension as well as a three-day bus suspension.  On September 21, 2009, D.S. engaged in behavior which resulted in a one-day bus suspension.  On September 30, 2009, D.S. engaged in behavior which resulted in a one-day in-school suspension.  On October 1, 2009, D.S. engaged in behavior which resulted in a one-day out-of-school suspension.  On October 7, 2009, D.S. engaged in behavior which resulted in a five-day out-of-school suspension. (Tr. 191.)

For the term ending October 9, 2009, it was reported that D.S. performed below the basic level in communication arts, science and health.  D.S. performed at the basic level in math and social studies, and at the proficient level in physical education, art and vocal music.  D.S.'s behavior and work habits were reported to be unsatisfactory.  (Tr. 189-90.)

On October 13, 2009, D.S. underwent a school psychiatric consultation at Armstrong Elementary School.  For purposes of this consultation, Dr. Meg Corrigan interviewed the school counselor, plaintiff and D.S.  Plaintiff reported D.S. to have previously been diagnosed with a heart murmur for which he was subsequently determined to be "fine."  Plaintiff also reported D.S. to have been diagnosed with ADHD, ODD, and possible depression.  Plaintiff

- 15 -

reported that D.S. had been prescribed Risperdal which made him
calmer, but that she stopped the medication inasmuch as it caused
D.S.'s heart to race.   Plaintiff also reported that D.S. had been
prescribed Tenex,[5] but that she stopped the medication because it
caused loss of appetite and hallucinations.[6]   Plaintiff reported
D.S. to currently be taking Concerta.   Dr. Corrigan noted D.S.'s
teachers to report that D.S. was calmer and more "zombie like" when
taking his medication.   Plaintiff reported D.S. to have problems
with anger and violent behavior, with reported examples including
kicking and hitting teachers and students, cursing at teachers and
bus drivers, threats to kill teachers and students, and tearing up
homework and books.   It was noted that D.S.'s behavior had resulted
in  multiple  in-school,  out-of-school,  and  bus  suspensions.
Plaintiff reported that D.S. used to try to set fire to paper and
grass and stored items under his bed such as screwdrivers, nails,
and socks with rocks in them.   Plaintiff reported that D.S. did not
engage in self-injurious behavior.   Plaintiff reported that D.S.
had been seeing a psychiatrist for two and one-half years.   During
her observation of D.S., Dr. Corrigan noted D.S. to be generally
cooperative but to test boundaries and limits.   D.S. was twirling

---

[5]Tenex is used to control symptoms of ADHD.   Medline Plus
(last reviewed Sept. 1, 2010)<http://www.nlm.nih.gov/medlineplus/
druginfo/meds/a601059.html>.

[6]Dr. Corrigan noted that on a parent information form,
plaintiff indicated that Tenex caused insomnia and Risperdal caused
hallucinations.   (Tr. 198.)

in his chair, rolling food on the table, and banging on the window trying to get the attention of children outdoors. Dr. Corrigan noted D.S.'s flow of thought to be concrete. D.S. self-reported that he angers easily and that he has been suspended for fighting with his teacher. D.S. also self-reported that he had a difficult time paying attention in class. D.S.'s mood was noted to be happy and his affect was nearly euthymic, stable, playful, and somewhat bright at times. D.S.'s insight and judgment were noted to be poor. Dr. Corrigan diagnosed D.S. with ADHD, combined type; ODD, rule out Conduct Disorder; Mood Disorder, not otherwise specified; rule out Bipolar Disorder, not otherwise specified; and rule out history of Psychosis, not otherwise specified. Dr. Corrigan assigned a GAF score of 45. Dr. Corrigan recommended weekly individual, family and behavioral therapy; frequent follow-up appointments with a psychiatrist; full IQ evaluation; psychological testing; neurological evaluation; monitoring for possible sexually inappropriate behaviors; returning to a cardiologist for follow up on the reported heart murmur; remaining on a waiting list for a Boys Town mentor; and following up with an eye doctor. (Tr. 193-207.)

D.S. returned to Dr. Muddasani on October 21, 2009, who noted D.S. to have assaulted a teacher and was kicked out of school. Complaints that Concerta was not working were noted. Dr.

Muddasani continued in his diagnoses of ADHD and ODD and prescribed Adderall[7] and Risperdal.  (Tr. 254.)

In a Diagnostic Report dated November 24, 2009 (Tr. 146-58.), the Special School District of St. Louis County reported that after a series of evaluations and reports, D.S. was determined to have an educational diagnosis of "Emotional Disturbance."  It was noted that D.S. was repeating the first grade.  It was reported that D.S. had been diagnosed with ADHD and ODD in 2007, was prescribed Risperdal and Adderall to be taken daily, and was inconsistent in taking his medication.  It was noted that plaintiff indicated a concern with home adaptive behavior with specific areas of concern noted to include complying with family rules, responding to discipline, displaying adequate self-control, and becoming easily frustrated and angry.  It was reported that D.S. attended church with his sitter and enjoyed video games, outdoor activities, community attractions, and music.  With respect to school performance, it was reported that D.S. performed in the lower third of his classes in all academic areas, performing below the basic level in communication arts, science, social studies, and health; at the basic level in math; and at the proficient level in physical education, art, and vocal music.  There were numerous concerns noted in the areas of life skills, daily and hourly task

---

[7]Adderall is used to control symptoms of ADHD.  Medline Plus (last revised Aug. 1, 2010)<http://www.nlm.nih.gov/medlineplus/druginfo/meds/a601234.html>.

orientation skills, and social/emotional skills.  On the Wechsler
Intelligence Scale for Children (4th edition), D.S.'s verbal
comprehension index was measured to be 89, perceptual reasoning
index was measured to be 102, working memory index was measured to
be 91, with full scale IQ measured to be 87.  Scores between 90 and
109 were within the average range.  On the Kaufman Test of
Educational Achievement (2nd edition), D.S.'s reading composite was
measured to be 108, written language composite was measured to be
102, sound-symbol composite was measured to be 102, and decoding
composite was measured to be 108.  Scores between 85 and 115 were
within the average range.  On the Learning Disability Evaluation
Scale, D.S. scored below average in the areas of listening,
thinking, speaking, reading, and writing.  D.S. scored within the
average range in the areas of spelling and mathematical
calculations.  On the Behavior Assessment for Children completed by
plaintiff, D.S. scored in the clinically significant range in the
areas of externalizing problems, internalizing problems, and
behavioral symptoms.  D.S. scored in the low range in the area of
adaptive skills.  On the Behavioral Assessment for Children
completed by D.S.'s teacher, D.S. scored in the clinically
significant range in the areas of externalizing problems, school
problems, and behavioral symptoms.  In the area of internalizing
problems, D.S. scored in the at-risk range.  In the area of
adaptive skills, D.S. scored in the very low range.  On the

Behavior Inventory of Executive Function completed by plaintiff and D.S.'s teacher, D.S. consistently scored in the significantly elevated area.  On the Brown Child ADD Scales, D.S. scored in the moderately atypical range.  The team determined D.S. to exhibit an inability to build or maintain satisfactory interpersonal relationships with peers and teachers and an inability to learn that could not be explained by intellectual, sensory, or health factors.  It was noted that D.S.'s social history included difficulties with compliance, acting out, peer relationships, violence, and fighting since daycare — having been suspended from daycare and Head Start.  It was noted that D.S. engaged in numerous incidents of disruptive and aggressive behaviors, resulting on one occasion with a call to the police to escort D.S. and his older brother home.  The team noted D.S. to engage in the following behaviors with such frequency and to such a marked degree that they adversely impacted D.S.'s educational performance: "inability to build and maintain satisfactory peer relationships resulting in incomplete work as well as lack of exposure to cooperative learning experiences.  [D.S.'s] lack of compliance and aggressive behaviors lead to his being absent from the classroom and presented instruction."  (Tr. 157.)  The team concluded:

> [D.S.'s] academic achievement is commensurate with his measured cognitive ability with visual motor and fine motor skills that are within normal limits for his age.  While [D.S.] appears to possess skills to achieve in

- 20 -

> the academic setting, his behaviors and
> emotional state clearly interfere.
>
> .  .  .  [T]he significant behaviors
> exhibited by [D.S.] best represent the
> educational disability of an Emotional
> Disturbance.  Additionally, the team has
> considered the impact that current life
> stressors have had on [D.S.], and have
> determined that the concerns identified within
> this evaluation have been long-standing and
> not just associated with any specific crisis
> or stressful situation.

(Tr. 158.)

An educational plan was recommended, which included intensive social skills instruction as well as development of coping skills to address anger, escalating aggression, and spiraling negative thoughts.  (Tr. 146-58, 192.)  It was noted that plaintiff was not present at this meeting.  (Tr. 164.)

On December 4, 2009, D.S. received a five-day out-of-school suspension.  (Tr. 191.)

After a visit with Dr. Muddasani on December 10, 2009, D.S. was prescribed Concerta and Tenex.  (Tr. 255.)

During an Individualized Education Program (IEP) meeting held January 13, 2010, D.S.'s diagnoses of Emotional Disturbance, ADHD, and ODD were noted.  D.S. was reported to be

> very tense and reactive. . . . He does not
> like confinement and has difficulty with close
> proximity of peers and adults.  He does not
> have an appropriate sense of play and is often
> very rough.  He wants to take the lead and
> have control of situations and will become

- 21 -

verbally and physically aggressive if denied.
(Tr. 209.)

It was determined that D.S. would receive special education
instruction in social skills and task related skills, as well as
psychological counseling.  It was also determined that D.S. would
participate in regular physical education, as well as in the
general education environment seventy-six percent of the time with
accommodations including preferential seating, timers for
assignments, allowance of frequent breaks, and positive
reinforcement.  It was determined that D.S. did not need
accommodations during district assessments.  (Tr. 208-22.)
Plaintiff did not attend this IEP meeting, having indicated that
she did not want to attend.  (Tr. 223.)

On January 23, 2010, Melissa Wright, D.S.'s first grade
teacher completed a School Activities Questionnaire at the request
of plaintiff's counsel.  Ms. Wright reported that she had known
D.S. for six months.  Ms. Wright reported that D.S. had been
suspended, disciplined, or expelled many times.  In the domain of
acquiring and using information, Ms. Wright reported that D.S. was
markedly limited in all areas including learning new material,
reading comprehension, following and understanding oral
instructions and classroom discussions, and solving math problems.
In the domain of attending and completing tasks, Ms. Wright
reported that D.S. was moderately limited in his ability to

- 22 -

remember and organize school materials and to complete homework assignments on time.  Ms. Wright reported that D.S. was markedly limited in his ability to avoid careless mistakes; and extremely limited in all other areas including remaining alert, focusing and maintaining attention, maintaining pace, and avoiding being fidgety and restless.  In the domain of interacting and relating with others, Ms. Wright reported that D.S. was markedly limited in his ability to make and keep friends, use appropriate facial expression, and consider others' feelings and points of view.  Ms. Wright reported D.S. to be extremely limited in all other areas including getting along with other children, following rules, obeying authority, and taking turns in and maintaining a conversation.  In the domain of moving about and manipulating objects, Ms. Wright reported that D.S. had no or slight limitations.  In the domain of caring for self, Ms. Wright reported D.S. to have extreme limitations in his ability to imitate healthy adult behavior; marked limitations in his abilities to avoid harmful behavior toward himself, regard safety rules, cope with stress, and cope with change; and moderate limitations in his ability to maintain hygiene and cleanliness.  (Tr. 166-70.)

D.S. underwent a psychological evaluation for disability determinations on March 17, 2010.  (256-61.)  Dr. Karen Hampton noted D.S. to be receiving IEP services at school and that previous records described ADHD as well as learning, mood, and behavioral

difficulties. Dr. Hampton noted that D.S. received medication and
in-home family therapy. Plaintiff reported to Dr. Hampton that the
weekly in-home therapy was beneficial but that they had sessions
only during the previous couple of weeks. Plaintiff also reported
D.S. to currently be taking Adderall. Plaintiff also reported that
D.S. had previously taken Risperdal, which was beneficial in that
it reduced D.S.'s aggressive behavior, but that Dr. Muddasani
recently discontinued the medication due to its effect being too
calming or sedating. Plaintiff reported D.S.'s mood and behavior
to vary day to day with poor reactions to changes in routine.
Plaintiff reported that behavioral incentive plans have been put in
place at home and at school. Plaintiff reported D.S. to be
physically resistant to limitations placed on him. Plaintiff
reported that she tries to give D.S. his medication in the morning,
but that she must "sweep[] his mouth" to make sure he takes it.
Plaintiff reported D.S. to have "short" self-control during the day
and that he becomes impatient in stores or in church and tries to
leave. Plaintiff reported that D.S. had shown some improvement
while being treated for ADHD but that he continued to have issues
with anger, noting as an example a fight which occurred at school
in December 2009 after which the police were called. Plaintiff
reported D.S. to be in the second grade, but D.S. stated that he
was currently in first grade having previously flunked the grade.
Mental status examination showed D.S. to be oriented and

cooperative and mildly guarded in affect.  D.S. reported that he used to see secret friends and a dog, but that when he rubbed his eyes they would be gone.  Dr. Hampton noted D.S. to have some difficulties with recall and appeared to have learned math skills by rote memorization without flexibility in learning and paying attention to different number patterns.  D.S.'s judgment in social reasoning was questionable in that D.S. appeared to respond with expected answers instead of what he actually would do in the posed hypothetical situations.  When asked how he got along with his brothers, D.S. responded "fine" but without example as to what activities they engage in.  Dr. Hampton opined that D.S. was trying to portray a positive self-concept to such an extreme so as to downplay and minimize any signs of distress or behavioral problems. D.S. expressed low emotional awareness.  Dr. Hampton determined D.S.'s abstract reasoning skills and intelligence to be low-average, indicating learning difficulties and emotional disturbances.  D.S.'s insight was noted to be poor.  Dr. Hampton diagnosed D.S. with Depression with psychotic features; ADD, combined type; Adjustment Disorder with mixed presentation, anxious and depressed mood; and Behavioral Disturbance.  Dr. Hampton assigned a GAF score of 57.[8]  Dr. Hampton concluded that D.S. was

---

[8]A GAF score of 51 to 60 indicates moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers).

mildly impaired in being able to understand
and recall simple instructions, and he would
be markedly limited in ability to understand
and follow through with complex directions.
Concentration is moderately impaired,
consistent with ADHD, for which he had taken
prescribed stimulant medication today.  His
pace on cognitive tasks is similar to other
same-age children.  His ability to adapt to
social situations is moderately limited, with
some improvement with treatment, but also with
a continued high level of psychosocial
stressors.

(Tr. 261.)

## IV.  The ALJ's Decision

The ALJ found D.S. to be a school-aged child and not to
have engaged in substantial gainful activity since November 20,
2008, the date the application for benefits was filed.  The ALJ
found D.S.'s impairment of ADHD to be severe.   The ALJ found,
however, that D.S. did not have an impairment or combination of
impairments that met or medically equaled the severity of any
impairment in the Listings of Impairments.  The ALJ also found that
D.S. did not have an impairment or combination of impairments which
functionally equaled the Listings.   The ALJ thus determined D.S.
not to have been disabled at any time since the filing of the
application, that is, November 20, 2008.  (Tr. 7-22.)

## V.  Discussion

A claimant under the age of eighteen is considered
disabled and eligible for Supplemental Security Income (SSI) under
the Social Security Act if he "has a medically determinable

- 26 -

physical or mental impairment, which results in marked and severe functional limitations, and which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."   42 U.S.C. § 1382c(a)(3)(C)(I).

        The Commissioner is required to undergo a three-step sequential evaluation process when determining whether a child is entitled to SSI benefits.  First, the Commissioner must determine whether the child is engaged in substantial gainful activity.  If not, the Commissioner must then determine whether the child's impairment, or combination of impairments, is severe.  Finally, if the child's impairment(s) is severe, the Commissioner must determine whether such impairment(s) meets, medically equals or functionally equals the severity of an impairment listed in Appendix 1 of Subpart P of Part 404 of the Regulations.  20 C.F.R. § 416.924(a); Garrett ex rel. Moore v. Barnhart, 366 F.3d 643, 647 (8th Cir. 2004).  If the impairment(s) meets or medically equals a Listing, the child is disabled.  Garrett, 366 F.3d at 647.  If a child's impairment does not meet or medically equal a listed impairment, the Commissioner will assess all functional limitations caused by the child's impairment to determine whether the impairment functionally equals the Listings.  20 C.F.R. § 416.926a.  To functionally equal a listed impairment, the child's condition must result in an "extreme" limitation of functioning in one broad

- 27 -

area of functioning, or "marked" limitations of functioning in two
broad areas of functioning.  20 C.F.R. § 416.926a(a).  The domains
are "broad areas of functioning intended to capture all of what a
child can or cannot do."  20 C.F.R. § 416.926a(b)(1).  The six
domains used by the Commissioner in making such a determination
are:  1) Acquiring and Using Information; 2) Attending and
Completing Tasks; 3) Interacting and Relating with Others; 4)
Moving About and Manipulating Objects; 5) Caring for Oneself; and
6) Health and Physical Well-Being.  Id.  If this analysis shows the
child not to have an impairment which is functionally equal in
severity to a listed impairment, the ALJ must find the child not
disabled.  Oberts o/b/o Oberts v. Halter, 134 F. Supp. 2d 1074,
1082 (E.D. Mo. 2001).[9]

        The Commissioner's findings are conclusive upon this
Court if they are supported by substantial evidence.  42 U.S.C. §
405(g); Young v. Shalala, 52 F.3d 200 (8th Cir. 1995) (citing Woolf
v. Shalala, 3 F.3d 1210, 1213 (8th Cir. 1993)).  Substantial
evidence is less than a preponderance but enough that a reasonable
person would find it adequate to support the conclusion.  Briggs v.
Callahan, 139 F.3d 606, 608 (8th Cir. 1998).  In evaluating the
substantiality of the evidence, the Court must consider evidence

---

        [9]The ALJ here determined that D.S. suffered marked limitations
in one domain of functioning, and less than marked or no
significant limitations in all other domains.  (Tr. 21.)  Plaintiff
makes no specific challenges to the ALJ's findings in the various
domains of functioning.

which supports the Commissioner's decision as well as any evidence which fairly detracts from the decision.  Id.  Where substantial evidence supports the Commissioner's decision, the decision may not be reversed merely because substantial evidence may support a different outcome.  Id.

In this cause, plaintiff claims that the ALJ erred in his adverse determination by failing to find D.S.'s diagnosed condition of ODD to be a severe impairment.  Plaintiff also claims that the ALJ erred by his failure to properly consider the opinions of D.S.'s teachers when conducting his functional analysis.  The undersigned will address each of plaintiff's contentions in turn.

A.   Step 2 Analysis – Failing to Find ODD as a Severe Impairment

Plaintiff claims that the ALJ erred by failing to find D.S.'s diagnosed condition of ODD to be a severe impairment. Assuming *arguendo* that such condition indeed constituted a severe impairment, the ALJ's failure to so find arises to nothing more than harmless error.

As the second step of childhood disability cases, the Commissioner is required to determine whether the child has an impairment or combination of impairments that is severe.  20 C.F.R. § 416.924(a), (c).  Here, at Step 2 of the sequential evaluation, the ALJ found D.S.'s ADHD to constitute a severe impairment but did not separately analyze or find D.S.'s ODD to be severe.  The failure of an ALJ to find an impairment to be severe at Step 2,

however, is harmless if the ALJ finds the claimant to suffer from another severe impairment, continues in the evaluation process, and considers the effects of the impairment at the other steps of the evaluation process.  <u>Jackson ex rel. K.J. v. Astrue</u>, 734 F. Supp. 2d 1343, 1361 (N.D. Ga. 2010) (harmless error analysis at Step 2 of child's disability case).  The ALJ did so here.

As noted above, despite not identifying ODD to be a severe impairment, the ALJ found D.S. to suffer from another severe impairment, that is, ADHD.  The ALJ then continued in the evaluation process and considered all aspects of D.S.'s reported behavior when determining whether D.S.'s impairment or combination of impairments functionally equaled a listed impairment.  Such analysis included plaintiff's report of D.S. fighting with and bullying other children, throwing tantrums, cursing at the bus driver, being suspended from school on multiple occasions, and showing hostility to authority.  (Tr. 14.)  The ALJ also acknowledged educational reports that D.S. had difficulties with social/emotional behavior, that his behavior adversely affected his educational performance, and that he had been given an educational diagnosis of Emotional Disturbance. (Tr. 14-15.) Finally, the ALJ discussed the medical and counselor records which noted aggressiveness, difficulty in unstructured settings, school suspensions, testing boundaries and limits, below normal ability to

relate socially without treatment, and assaulting a teacher.  (Tr. 15-16.)

A review of the ALJ's decision *in toto* shows that, subsequent to his analysis at Step 2, the ALJ considered and evaluated all of D.S.'s behavioral issues in determining whether D.S.'s impairment, or combination of impairments, functionally equaled a listed impairment.  Given the ALJ's awareness that D.S. had been diagnosed with ODD and his thorough discussion of the evidence of record relating to D.S.'s oppositional behavior in conjunction with D.S.'s symptoms of ADHD, the failure to include ODD as a severe impairment at Step 2 was harmless.  Jackson, 734 F. Supp. 2d at 1362; see also Murray v. Astrue, No. 1:12cv08, 2012 WL 3730675, at *20 (N.D. W. Va. July 27, 2012)  (noting, "importantly, according to the DSMIV,[10] ADHD and ODD share numerous traits," district court determined that failure of ALJ to find ODD as a severe impairment was harmless where ALJ found ADHD and Bipolar Disorder to be severe and continued in evaluation process).

Accordingly, plaintiff's claim that the Commissioner's decision should be reversed on account of the ALJ's failure to find D.S.'s ODD to be a severe impairment at Step 2 of the sequential analysis should be denied.

---

[10]Diagnostic and Statistical Manual of Mental Disorders (4th ed. 2000).

B.    Teacher Opinion Evidence

Plaintiff claims that the ALJ improperly evaluated the opinion evidence obtained from D.S.'s first grade teachers, Ms. Chitwood and Ms. Wright.

Teachers are relevant sources of information in determining childhood disability. 20 C.F.R. § 416.924a(a)(2)(iii). Indeed, Social Security Ruling 06-3p considers some non-medical sources, such as teachers and other educational personnel, to be "valuable sources of evidence for assessing impairment severity and functioning" inasmuch as they often "have close contact with the individuals and have personal knowledge and expertise to make judgments about their impairment(s), activities, and level of functioning over a period of time."  SSR 06-03p, 2006 WL 2329939, at *3 (S.S.A. Aug. 9, 2006).  When considering opinion evidence from such a source, the Commissioner may consider such factors as

> the nature and extent of the relationship between the source and the individual, the source's qualifications, the source's area of specialty or expertise, the degree to which the source presents relevant evidence to support his or her opinion, whether the opinion is consistent with other evidence, and any other factors that tend to support or refute the opinion.

Id. at *5.

Ruling 06-03p further counsels that, in his decision, the ALJ should explain the weight given to teachers' opinions, "or

- 32 -

otherwise ensure that the discussion of the evidence in the . . . decision allows a claimant or subsequent reviewer to follow the adjudicator's reasoning."  Id. at *6.

Here, the ALJ identified and described the responses given by Ms. Chitwood and Ms. Wright in their Teacher Questionnaires completed in January 2009 and January 2010, respectively. Specifically, the ALJ noted Ms. Chitwood to indicate that D.S. was performing on level in math, but below level in written language; that D.S. was not getting special education services but was receiving reading support; that D.S. had problems with acquiring and using information, and attending to and completing tasks; that D.S. had trouble focusing with difficult tasks and was not asking for help; that D.S. needed a great deal of support and supervision to complete reading and writing tasks; and that D.S. was receiving rewards for behavior modification.  The ALJ also noted Ms. Chitwood's observation that D.S. was able to perform his class work much better while taking medication, but that D.S. did not take his medication on a regular basis. (Tr. 14-15.)  With respect to Ms. Wright's Questionnaire, the ALJ noted her opinion that D.S. was markedly impaired in all areas of acquiring and using information, and extremely impaired in almost all areas of attending and completing tasks.  The ALJ also noted, however, that the form was completed in a checklist format without written comment or explanation.  (Tr. 15.)

Upon  review  of  the  other  evidence  of  record,  the  ALJ
discussed the teachers' opinions against the backdrop of the record
as  a  whole:

> The claimant's level of functioning for the
> domains  must  be  considered  with  proper
> adherence  to  the  following  of  recommended
> treatment.    The  claimant's  teacher,  [Ms.
> Chitwood],  specifically  noted  that  the
> claimant's  functioning  was  better  in  school
> when  he  was  taking  medication,  but  he
> deteriorated as he reported that he was not
> actually  taking  the  prescribed  medication.
> Although a form was submitted . . . from the
> claimant's  first  grade  teacher,  [Ms.  Wright],
> it  simply  had  marks  indicating  that  almost
> everything  was  markedly  to  extremely  limited.
> However,  the  teacher  made  no  supporting
> statements  and  did  not  indicate  whether  the
> performance  was  in  relation  to  the  claimant
> taking  or  not  taking  prescribed  medications.
> The severity of the problems described in the
> form therein are not even consistent with the
> Special School District assessments since with
> the  severity  described  in  the  form  the
> claimant  would  not  be  able  to  have  placement
> within  a  regular  classroom.    The  IEP  shows
> that the claimant is in a regular classroom 76
> percent  of  the  time,  and  does  not  require
> placement  in  a  classroom  for  children  with  a
> behavior  disorder.    The  claimant's  mother  has
> given conflicting statements about why she has
> discontinued  the  giving  of  medications.    For
> example,  she  has  on  different  occasions
> reported  that  Tenex  was  discontinued  due  to
> conflicting    reasons    of    insomnia,
> hallucinations,  and  his  heart  racing.    When
> the  claimant  was  seen  for  psychological
> evaluation  by  Allison  Burner  on  March  31,
> 2009, the claimant's mother reported that her
> son  was  taking  prescribed  medications  even
> though  both  bottles  prescribed  two  months
> earlier  remained  totally  full.    At  the  recent
> exam  by  Karen  Hampton,  Ph.D.  the  claimant's
> mother had quit giving her son the Risperdal

for the last two weeks.  The school
psychologist had recommended ongoing therapy,
family therapy, and frequent medication
monitoring, but the claimant is seen only
sporadically by the treating psychiatrist.

(Tr. 21.)

A review of the ALJ's treatment of Ms. Chitwood's and Ms.
Wright's opinions shows him to have considered the factors set out
in SSR 06-03p and to have discussed the opinions in such a fashion
so as to ensure that his reasoning was understood.  Specifically,
the ALJ noted the nature of Ms. Chitwood's and Ms. Wright's
relationship with D.S. was that of a teacher-student; that Ms.
Chitwood taught D.S. in all core classes and that Ms. Wright was
D.S.'s current teacher; that Ms. Chitwood provided explanation for
her opinions — including that D.S. performed his class work much
better while taking medication, while Ms. Wright provided no
supporting explanation for her opinions; that the marked and
extreme limitations opined by Ms. Chitwood and Ms. Wright were
inconsistent with other evidence in the record obtained from
educational personnel and evaluating psychologists; and that D.S.'s
failure to consistently take medication, failure to undergo
recommended therapy, and failure to regularly see his psychiatrist
were significant factors in finding D.S. not to be so limited as
opined.  Substantial evidence on the record as a whole supports
this reasoning.

While the record is replete with evidence that D.S. engaged in recalcitrant behavior, evidence shows that many professionals opined that D.S. would improve with medication, therapy, and school intervention.  (See Tr. 234 - Dr. Dahlgren (2007) opining that medication and therapy may be helpful and, with school interventions, D.S. "should be able to respond with greater learning and social potential"; Tr. 244 – Psychologist Burner (2009) opining that "[w]ith appropriate medical and educational intervention, he should be able to obtain a high [school] diploma. . . . With treatment, his symptoms should be sufficiently controlled and he should be able to attain at a level commensurate with his ability."; Tr. 207 – Dr. Corrigan (2009) opining that D.S. should participate in therapy, frequently follow up with his psychiatrist, and undergo psychological testing).  However, despite these repeated recommendations for treatment and therapy with calculated improvement, and despite evidence of D.S.'s improvement while receiving such treatment and therapy, plaintiff was inconsistent in the administration of D.S.'s medication and inconsistent in obtaining the recommended psychiatric treatment and therapy.  Although plaintiff reported that she determined to cease giving D.S. certain medications due to adverse side effects, there is no independent evidence in the record regarding such side effects.  Nor is there any evidence that she reported such side effects to D.S.'s treating psychiatrist or that she sought

- 36 -

alternative treatment.  Instead, plaintiff determined unilaterally to stop giving D.S. his prescribed medication.  As evidenced in the record, D.S.'s observed behavior deteriorated when he did not take his medication.  A parent's failure to consistently administer effective medication as prescribed without good reason can be a proper ground for denying childhood disability benefits.  Blake ex rel. Blake v. Barnhart, 28 Fed. Appx. 597, 599 (8th Cir. 2002) (unpublished) (per curiam) (citing Kelley v. Callahan, 133 F.3d 583, 589 (8th Cir. 1998)); Dunahoo v. Apfel, 241 F.3d 1033, 1039-40 (8th Cir. 2001) (failure to follow through with recommended treatment an appropriate basis to deny disability benefits).

In addition, although plaintiff reported in October 2009 that D.S. had been treated by a psychiatrist for a period of two and a half years, the record shows D.S.'s initial treatment with Dr. Muddasani to have occurred in July 2008.  Further, the record also shows that for the seventeen-month period between July 2008 and December 2009, D.S. saw Dr. Muddasani on only four occasions.  Indeed, in April 2009, Dr. Muddasani noted that D.S. did not keep appointments and was not on any medications.  Finally, despite being advised in September 2007 that in-home therapy would be beneficial to D.S., and receiving a recommendation in October 2009 that D.S. receive therapy services, plaintiff reported in March 2010 that such services had only recently begun.[11]  Cf. Wade for

---

[11]Other than this statement by plaintiff to Dr. Hampton in March 2010, there is no independent evidence in the record

<u>Robinson v. Callahan</u>, 976 F. Supp. 1269, 1275 (E.D. Mo. 1997) (lack of ongoing treatment inconsistent with claim of disability in child-benefits case).

In light of the above, the ALJ properly considered the opinions rendered by D.S.'s first grade teachers and, upon review of the entire record as a whole, evaluated such opinions in accordance with the factors set out in SSR 06-03p.  There was sufficient evidence in the record upon which the ALJ made informed findings regarding the inconsistencies between the teachers' opinions and the other evidence of record, and such findings are supported by substantial evidence on the record as a whole.  The ALJ was therefore not required to more fully develop the record to resolve any inconsistencies between the teachers' opinions and other record evidence.  <u>Halverson v. Astrue</u>, 600 F.3d 922, 933 (8th Cir. 2010); <u>Cox v. Astrue</u>, 495 F.3d 614, 618 (8th Cir. 2007); <u>Conley v. Bowen</u>, 781 F.2d 143, 146 (8th Cir. 1986).

### VI.  Conclusion

For the reasons set out above on the claims raised by plaintiff on this appeal, the ALJ did not legally err in his determination to deny D.S. disability benefits, and the decision is supported by substantial evidence on the record as a whole.  As such, plaintiff's claims of error should be denied.  <u>Hensley v. Barnhart</u>, 352 F.3d 353, 355 (8th Cir. 2003) (even in close cases,

---

demonstrating that D.S. participated in such therapy.

the court's role is "simply to review the record for legal error and to ensure that the factual findings are supported by substantial evidence."). Inasmuch as there is substantial evidence to support the Commissioner's decision, this Court may not reverse the decision merely because substantial evidence exists in the record that would have supported a contrary outcome or because another court could have decided the case differently. <u>Gowell v. Apfel</u>, 242 F.3d 793, 796 (8th Cir. 2001); <u>Browning v. Sullivan</u>, 958 F.2d 817, 821 (8th Cir. 1992).

Accordingly, the Commissioner's determination that D.S. was not disabled at any time since the filing of the application, that is, November 20, 2008, should be affirmed.

Therefore, for all of the foregoing reasons,

**IT IS HEREBY ORDERED** that the decision of the Commissioner is **AFFIRMED** and plaintiff's Complaint is dismissed with prejudice.

Judgment shall be entered accordingly.

_____
UNITED STATES MAGISTRATE JUDGE


Dated this _19th_ day of September, 2012.